IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| KAZEE, INC., <br><br> Plaintiff, <br><br> v. <br><br> DR. BEN G. RAIMER, in his official capacity as President Ad Interim of The University of Texas Medical Branch, and TODD LEACH, in his official capacity as Chief Information Officer of the University of Texas Medical Branch, <br><br> Defendants. | § § § § § § § § § § § § § § § § Civil Action No. 4:19-cv-00031-KPJ |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Plaintiff KaZee, Inc.'s Motion to Compel and for *In Camera* Review (the "Motion") (Dkt. 88), to which Defendants Dr. Ben G. Raimer and Todd Leach filed a response (Dkt. 96), and Plaintiff filed a reply (Dkt. 97). For the reasons explained below, the Motion is **GRANTED IN PART AND DENIED IN PART**.

### I.   BACKGROUND

On January 15, 2019, KaZee, Inc. ("Plaintiff or "KaZee") filed a Verified Complaint and Application for Preliminary and Permanent Injunctive Relief (the "Complaint") (Dkt. 1). Plaintiff is a provider of information technology products and services for the healthcare industry, including an electronic health records software known as PEARL. *See* Dkt. 1 at 1. Plaintiff asserts two causes of action against Dr. Ben G. Raimer, in his official capacity as President Ad Interim of The University of Texas Medical Branch ("UTMB"), and Todd Leach, in his Official Capacity as Chief Information Officer of UTMB (collectively, "Defendants"), related to the ongoing use of Plaintiff's PEARL software by UTMB. Plaintiff alleges copyright infringement pursuant to 17

1

U.S.C. § 501, and misappropriation of trade secrets under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836. *See* Dkt. 1 at 10–12.

In the Motion, Plaintiff requests that the Court order Defendants to produce certain documents withheld from production, which are identified on Defendants' privilege log: (1) an analysis comparing UTMB's EMR Lite software with Plaintiff's PEARL Software (the "EMR Lite Analysis"); and (2) communications between UTMB employees and in-house counsel (the "Licensing Emails"). *See* Dkt. 88 at 1.

Defendants initially withheld the EMR Lite Analysis from production, asserting that it was beyond the scope of the claims asserted in Plaintiff's Complaint, and thus, not relevant to the claims or defenses in this lawsuit. *See* Dkt. 77 at 2. Plaintiff disagreed, asserting the EMR Lite Analysis was relevant to its argument that Defendants used the PEARL software beyond the scope of the licensing agreement, and creating the EMR Lite software as a derivative of PEARL would amount to use of the PEARL software beyond the scope of the licensing agreement. *See id.* The parties presented this discovery dispute to Magistrate Judge Nicole Mitchell pursuant to the Eastern District of Texas's Discovery Hotline. *See* Dkt. 77. Judge Mitchell ordered Defendants to produce the EMR Lite Analysis unless they could identify a privilege basis for withholding the documents. *See id.* Defendants only then asserted the attorney-client privilege and work product privilege with respect to the EMR Lite Analysis. *See* Dkt. 88-1 at 30.

With respect to the Licensing Emails, Defendants assert the attorney-client privilege, as they include emails between Defendants and their legal counsel. *See* Dkt. 88-1 at 4–5. Plaintiff agrees that the Licensing Emails are protected by the attorney-client privilege; however, Plaintiff contends that Defendants waived the privilege by allowing a UTMB senior employee to testify about the legal advice contained in the Licensing Emails.

The Court inspected the documents at issue *in camera*. Additionally, on October 22, 2020, the Court heard oral argument on the Motion (the "Hearing"), as well as testimony from Todd Leach regarding the EMR Lite Analysis. *See* Dkt. 109.

## II.   LEGAL STANDARD

The attorney-client privilege protects communications between an attorney and a client made for the purpose of furnishing or obtaining professional legal advice or assistance. *In re LTV Securities Litigation*, 89 F.R.D. 595, 599–600 (N.D. Tex. 1981). The privilege exists to protect both the giving of professional advice to those who can act on it and also the giving of information to the lawyer to enable him to give sound advice. *Upjohn Company v. United States*, 449 U.S. 383, 390 (1981). When legal advice is sought from a professional legal adviser in his capacity as a legal adviser, the communications relevant to that purpose, made in confidence by the client, are, at the instance of the client, permanently protected. *Diversified Industries, Inc. v. Meredith*, 572 F.2d 596, 602 (8th Cir. 1977). The attorney-client privilege is construed "no more broadly than is necessary to effectuate its purpose." *In re LTV Sec. Litig.*, 89 F.R.D. at 600.

The work-product doctrine, codified in Rule 26(b)(3) of the Federal Rules of Civil Procedure, states:

> A. Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent). But subject to Rule 26(b)(4), those materials may be discovered if:
>
> > (i) they are otherwise discoverable under Rule 26(b)(1); and
> > (ii) the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship obtain their substantial equivalent by other means.

FED. R. CIV. P. 26(b)(3)(A); *see also Dunn v. State Farm Fire & Cas. Co.*, 927 F.2d 869, 875 (5th Cir. 1991); *Nance v. Thompson Med. Co.*, 173 F.R.D. 178, 181 (E.D. Tex. 1997). Essentially, the

3

work-product doctrine protects documents and other tangible things prepared by a party or representative of a party in anticipation of litigation. *See Hickman v. Taylor*, 329 U.S. 495 (1947); *Thomas v. General Motors Corp.*, 174 F.R.D. 386, 388 (E.D. Tex. 1997). As set forth in the Advisory Committee Notes to Rule 26(b)(3), "[m]aterials assembled in the ordinary course of business, or pursuant to public requirements unrelated to litigation . . ." are excluded from work product materials. *United States v. El Paso Co.*, 682 F.2d 530, 542 (5th Cir. 1982); *Pacamor Bearings, Inc. v. Minebea Co., Ltd.*, 918 F.Supp. 491, 512–13 (D.N.H. 1996). "This is true 'even if the party is aware that the document may also be useful in the event of litigation.'" *Pacamor Bearings*, 918 F. Supp. at 513 (internal quotations omitted).

"[D]etermining whether a document is prepared in anticipation of litigation can be a slippery task." *El Paso*, 682 F.2d at 542. The general rule is that "litigation need not be imminent . . . as long as the primary motivating purpose behind the creation of the document was to aid in possible future litigation." *Id*. (quoting *United States v. Davis*, 636 F.2d 1028, 1040 (5th Cir. 1981)).

> Factors that courts rely on to determine the primary motivation for the creation of a document include the retention of counsel and his involvement in the generation of the document and whether it was a routine practice to prepare that type of document or whether the document was instead prepared in response to a particular circumstance. . . . If the document would have been created regardless of whether litigation was expected to ensue, the document is deemed to have been created in the ordinary course of business and not in anticipation of litigation.

*Elec. Data Sys. Corp. v. Steingruber*, No. 4:02-cv-225, 2003 WL 21653414, at *5 (E.D. Tex. July 9, 2003) (citing *Piatkowski v. Abdon Callais Offshore, L.L.C.*, No. 99-3759, 2000 WL 1145825 at *2 (E.D. La. Aug. 11, 2000)). "If the document would have been created regardless of whether litigation was expected to ensue, the document is deemed to have been created in the ordinary course of business and not in anticipation of litigation." *Id*.

The protection offered by the work-product doctrine is not absolute. *See Conoco Inc. v. Boh Bros. Const. Co.*, 191 F.R.D. 107, 118 (W.D. La. 1998). Documents determined to be work product may still be subject to disclosure in discovery under certain circumstances. *See id*. The party seeking production of the document otherwise protected by the work product doctrine bears the burden of establishing that the materials should be disclosed. *See Hodges, Grant, & Kaufmann v. United States*, 768 F.2d 719, 721 (5th Cir. 1985); *Varel v. Banc One Capital Partners, Inc.*, No. CA3:93-cv-1614-R, 1997 WL 86457, *2 (N.D. Tex. Feb. 25, 1997). The burden on the party seeking production varies with respect to the nature of the work product sought. *See Conoco*, 191 F.R.D. at 118.

### III.    ANALYSIS

#### A. <u>EMR Lite Analysis</u>

Defendants, in their assertion of attorney-client and work product privilege, argue the EMR Lite Analysis is an "[i]nternal comparative analysis of UTMB's EMR Lite with Pearl software," created by Steve Schmid throughout June and August 2017, "at the direction of UTMB legal counsel for purposes of legal evaluation of claims made by KaZee." Dkt. 96-1 at 2. In the Declaration of Todd Leach ("Leach") (Dkt. 96-4), Leach recounted discussions and actions taken in June of 2017, related to the EMR Lite Analysis. Leach testified he received an email on June 7, 2017, from Albert Woodard, then Chairman of KaZee's Board of Directors, who claimed KaZee had ownership rights to EMR Lite as a derivative product of the Pearl EMR database. *See* Dkt. 96-4 at 3–4. Leach further testified:

> After receiving the June 7th email, I requested a meeting with UTMB Legal Affairs, including attorneys Gregory Etzel, Nathan Andersen, and Rohan Hebbar. I was concerned that KaZee's allegations may be escalated, to include possible litigation, because I felt that KaZee was taking a different more adversarial tone, in its allegations than it had in past correspondence and in claiming ownership of the EMR Lite product. One of the above attorneys instructed me to gather information

>that would support UTMB's position that EMR Lite was not a derivative product of PEARL.

Dkt. 96-4 at 4. Leach recounted that in preparation for the meeting with legal counsel, he asked Jesse Seelbach ("Seelbach") to direct his staff to do a comparison of EMR Lite to PEARL. *See* Dkt. 96-4 at 4. These statements, on their face, recite a series of events: (1) Leach received an email on June 7, 2017; (2) Leach requested a meeting with UTMB Legal Affairs; (3) one of UTMB's attorneys instructed Leach to gather information to support UTMB's position; and (4) Leach asked Seelbach to order the creation of what was to become the EMR Lite Analysis. At the Hearing, Plaintiff questioned Leach about these events. Specifically, Plaintiff questioned the timing of the instruction from UTMB Legal Affairs to gather information and whether it actually preceded Leach's internal request that led to creation of the EMR Lite Analysis.

Leach testified that the statement in his Declaration—that he was given an instruction by counsel to gather information—referred to two instructions from counsel. One, an instruction given after the June 7, 2017, email, ***and also***, an identical instruction given several years prior. Leach testified that when he made the statement in his Declaration reciting the events following the June 7, 2017, email, therefore, he was also referencing an instruction given by counsel several years prior. Notably, the Declaration is devoid of any information supporting such an assertion.

The timeline of events is crucial. In order to be afforded attorney-client privilege, the EMR Lite Analysis must have been created following direction from legal counsel. It is uncontested that by June 6, 2017, Leach had directed Seelbach to create the EMR Lite Analysis. *See* Dkt. 96-4 at 10. Specifically, Leach indicated in an email on June 6, 2017, that "Jesse is conducting a more detailed analysis of EMR Lite." Dkt. 96-4 at 10. Leach could not recall his request for a meeting with legal counsel. He assumed he requested a meeting by phone call but was uncertain. The first meeting with legal counsel, according to testimony and records, took place several weeks after the

June 7, 2017, email. Therefore, the evidence supports that any instruction by counsel in response to the June 7, 2017, email came well after Seelbach began conducting the analysis that would become the EMR Lite Analysis.

After examination of Leach, the Court is unconvinced that his Declaration testimony—that counsel directed him to gather information to support UTMB's position—refers to an instruction of counsel given *before* Leach ordered the creation of the EMR Lite Analysis. Nor is the Court convinced that the EMR Lite Analysis was prepared in anticipation of litigation. Seelbach testified that the purpose of the EMR Lite Analysis was to evaluate a letter from Plaintiff seeking licensing fees. *See* Dkt. 88-2 at 6; 101:22–102:13. Notably, this litigation did not commence for more than a year following the creation of the EMR Lite Analysis. To the extent, as Leach testified, the topic had arisen with counsel several years prior—that is, to the extent counsel indicated a possible need to conduct a comparison of EMR Lite with PEARL—the Court finds the evidence does not support a discussion of a theoretical need, several years prior to the actual incident, amounts to a directive to create the EMR Lite Analysis at the request of or for legal counsel. Defendants have offered no case law that supports such an attenuated connection.

After *in camera* review, the Court concludes the EMR Lite Analysis does not appear to contain or involve legal advice or communication with legal counsel. The Court finds the attorney-client and work product privilege do not cover the EMR Lite Analysis. The EMR Lite Analysis should be produced in full to Plaintiff (Bates Number UTMBP-000001–UTMBP-096).

B. **Licensing Emails**

The disagreement over the Licensing Emails is not whether the privilege applies, but whether the privilege was waived. *See* Dkt. 96 at 10. Seelbach testified about an email exchange between himself and Plaintiff's CEO Mickey Bourdeau regarding the scope of UTMB's license.

*See* Dkt. 88-3. In the emails, Bourdeau stated his belief that UTMB's license could "only be used for UTMB/TDCJ/TT project unless there [were] another agreement in place." Dkt. 88-3. Seelbach wrote back that he "spoke with [UTMB's] Legal department and they agree[d] with" Bourdeau's assessment. *Id*.

In his deposition, Seelbach testified, without objection from counsel, regarding the communication with UTMB's Legal department referenced in his email exchange with Bourdeau. *See* Dkt. 88-2 at 3; 41:20–43:23. Specifically, Seelbach testified:

> Q. And what you told Mr. Bourdeau on April 21st, 2015, "I spoke with our Legal department and they agree with your assessment below." That was true, correct?
>
> A. Well, I don't know what went into their assessment, I wasn't part of it, but in speaking with them, they thought it was best to take a conservative approach in order to hopefully avoid any legal potential issues down the road. So they -- they stated that we should go ahead and be safe. We -- we tend to be a conservative institution so they said let's go on and do the contract.
>
> . . .
>
> Q. I -- I need to make sure I understand. Mr. Seelbach, did you speak with the legal department?
>
> A. I did.
>
> Q. Did they agree with Mr. Bourdeau's assessment in this e-mail as you state here in your e-mail?
>
> A. Those were not their words. Those were my words.
>
> Q. Did they communicate with you to communicate to Mr. Bourdeau that they agreed with his assessment?
>
> A. No, sir. They told me that they believed the correct approach was to license it to be safe.
>
> Q. All right. So what they told you was to go ahead and get an additional license for whether it be MTC or small county jails or any other entities, to go ahead and get an additional license in place for PEARL; is that right?

      A. They suggested it would be the safe move.

Dkt. 88-2 at 3; 41:20–43:23.

      "A client waives the attorney-client privilege . . . by failing to assert it when confidential information is sought in legal proceedings." *Nguyen v. Excel Corp.*, 197 F.3d 200, 206 (5th Cir. 1999). "[I]nquiry into the substance of the client's and attorney's discussions does implicate the privilege and an assertion is required to preserve the privilege." *Id*. When Plaintiff questioned Seelbach on this issue, Defendants' counsel did not assert privilege, and therefore, waived any objection about the portions of the attorney-client communications Seelbach recounted in his testimony.

      Additionally, "[w]hen relayed to a third party that is not rendering legal services on the client's behalf, a communication is no longer confidential, and thus it falls outside of the reaches of the privilege." *Nguyen*, 197 F.3d at 207. "Therefore, a client implicitly waives the attorney-client privilege by testifying about portions of the attorney-client communication." *Id*. Here, Seelbach disclosed portions of the substance of his communications with counsel, waving attorney-client privilege over that communication—that is, the counsel's belief that additional licensing for PEARL was required for expansion into county contracts. *See* Dkt. 88-2 at 3; 41:20–43:23.

      The waiver, however, is not unlimited; as such, the Court must determine the scope of the waiver. "The general rule regarding the voluntary disclosure of privileged attorney-client communications is that the disclosure waives the privilege as to all other communications on the same subject." *Sky Techs. LLC v. IBM, Inc.*, No. 2:03-CV-454, 2006 WL 8441534, at *4 (E.D. Tex. Feb. 13, 2006) (quoting *Katz v. AT & T Corp.*, 191 F.R.D. 433, 439 (E.D. Pa. 2000)). "Courts have recognized that it would be fundamentally unfair to allow a party to disclose opinions which

support its position and to simultaneously conceal those that are unfavorable or adverse to its position." *Id.* "Because of this principle, a waiver of the privilege in an attorney-client communication, even an inadvertent one, 'extends to all other communications relating to the same subject matter.'" *Sky Techs.*, 2006 WL 8441534, at *4 (quoting *Minebea Co., Ltd. v. Papst*, 228 F.R.D. 34, 35 (D.D.C. 2005) (internal citation omitted)).

The Court reviewed Defendants' privilege log and the relevant documents constituting the Licensing Emails *in camera*. Upon such review, the Court finds that only one of seven emails, which comprise the Licensing Emails, falls within the scope of the waiver. The other six fall outside of the scope of the waiver. As such, the Court orders the production of the single email (Bates Number UTMBP-KZ0000749).

## IV. CONCLUSION

Upon consideration, therefore, Plaintiff's Motion to Compel and for *In Camera* Review (Dkt. 88) is **GRANTED IN PART and DENIED IN PART**.

Defendants are ordered to produce to Plaintiff, by 9:00 p.m., October 30, 2020, the EMR Lite Analysis (Bates Number UTMBP-000001–UTMBP-096) and one Licensing Email (Bates Number UTMBP-KZ0000749). All other relief is **DENIED**.

Upon review of the produced materials, to the extent Plaintiff believes additional discovery is warranted prior to the preliminary injunction hearing, currently set on November 17 & 18, 2020, Plaintiff shall notify the Court on or before **November 2, 2020**, regarding specific discovery requests. Moreover, Plaintiff may question Defendants' 30(b)(6) witness at the Court-ordered deposition related to Plaintiff's Combined Response in Opposition to Defendants' Motion for Leave to file Amended Answers and Motion to Exclude Defendants' Evidence at Injunction Hearing (Dkt. 79), which is set to occur on Tuesday, November 3, 2020, about the EMR Lite

Analysis (Bates Number UTMBP-000001–UTMBP-096) and the Licensing Email (Bates Number UTMBP-KZ0000749).

**So ORDERED and SIGNED this 30th day of October, 2020.**

_____
KIMBERLY C. PRIEST JOHNSON
UNITED STATES MAGISTRATE JUDGE